IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Randi Roth, | ) | No.   06 C 3564 |
| | ) | |
| Plaintiff, | ) | |
| | ) | The Honorable William J. Hibbler |
| | ) | |
| v. | ) | |
| | ) | |
| Godiva Chocolatier, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Randi Roth worked for Godiva Chocolatier for approximately seven and a half years before her employment was terminated in 2005. On July 17, 2006, Roth filed a complaint with this Court alleging that she was fired in retaliation for filing a workers' compensation claim. On April 6, 2007, Godiva moved for summary judgment claiming that Roth was terminated solely because of her job performance. For the reasons set forth below, Godiva's motion for summary judgment is DENIED.

### I. Factual Background

On August 25, 1997, Godiva, a purveyor of fine chocolates, hired Randi Roth as the store manager of its retail location in Old Orchard Mall in Skokie, Illinois. (Def. 56.1(a) St. ¶ 3.) As a store manager, Roth was responsible for training, hiring, merchandising, implementing store promotions, and staffing the store. (Def. 56.1(a) St. ¶¶ 15-18.) Beginning in September 2000, Roth assumed the additional responsibility of Area

1

Training Manager ("ATM"). (Def. 56.1(a) St. ¶ 13.) As an ATM, Roth's duties included: training new store managers, tracking and reporting the training progress of employees in the district, and producing a monthly corporate newsletter. (*Id.*) In 2002, Roth was transferred to the Woodfield Mall Store in Schaumburg, Illinois. (Def. 56.1(a) St. ¶ 3.) Roth's employment with Godiva was terminated on February 8, 2005. (Def. 56.1(a) St. ¶ 69.)

*Evaluative Criteria*

Godiva uses a myriad of measures to assess the performance of its retail employees, including the ominously named "mystery shop." To conduct its mystery shops, Godiva contracts with a third-party vendor that sends individuals posing as sincere customers into Godiva's retail locations. (Def. 56.1(a) St. ¶¶ 19-21.) The mystery shoppers interact with the staff in order to assess the store's adherence to Godiva's standards and policies. (*Id.*) The stores are then rated in a number of areas including: whether the customer was offered a product sample, whether the customer was informed of promotions and discounts and whether the customer was greeted in a courteous fashion. (*Id.*) The store is given a mystery shop score ranging from platinum (the best) to gold, black, or red (the worst). (*Id.*) Mystery shops occur anywhere from 4 to 12 times a year. (*Id.*)

In addition to mystery shops, store managers are evaluated on how well they administer Godiva's Customer Connect program. (Def. 56.1(a) St. ¶ 22.) The Customer Connect program is designed to assist Godiva in securing contact information from customers to let them know about future promotions and samplings. (*Id.*) Godiva's

2

expectation was that the stores would obtain customer contact information on a certain percentage of all sales transactions.[1] (Def. 56.1(a) St. ¶ 23; Roth Dep. at 70.)

Godiva also required its store mangers to display fresh fruit that had been dipped in chocolate and to set up "coffee breaks" with local businesses. (Def. 56.1(a) St. ¶ 46; Roth Dep. at 167.) For coffee breaks, Godiva staff would travel to different offices and bring coffee and product samples for the employees. (Def. 56.1(a) St. ¶ 46.) According to Roth's supervisor (District Manager Michelle M. Dalton), the goal was to have two coffee breaks per month. (Def. 56.1(a) St. ¶ 47.)

*Roth's Past Performance*

Prior to her dismissal, Roth was an exceptional employee. Roth received numerous awards at the district, regional and national level. For example, Roth received "model store" certification for 2004, managed the store of the year for 1999-2000, had the highest sales increase over goal for 2001-02, and was a Gold Star Sales Performer for quarters 2-4 of 2003/04. (Pl. 56.1(b)(3) St. ¶ 4.) Godiva does not quarrel with the notion that Roth experienced "past success" with the company. (Def. Mem. Of Law in Support of Summary Judgment at 2.)

*The Injury*

On July 27, 2004, Roth was standing on a step-stool retrieving a box of napkins when she turned and felt something "pull in her back." (Def. 56.1(a) St. ¶ 29; Roth Dep. at 108.) Roth returned to work the next day, but the pain worsened. (Roth Dep. at 108-109.) Subsequently, Roth consulted the services of a physician and discovered that she had two herniated discs in her back. (Roth Dep. at 242). Although Godiva's accident policy mandates that all workplace injuries are to be reported within eight hours, Roth did

---

[1] The parties dispute the percentage that store managers were expected to achieve.

3

not fill out the Workers Compensation Telephone Reporting Worksheet until August 2, 2004. (Def. 56.1(a) St. ¶¶ 29- 32.)

*Roth's Post-Injury Job Performance*

On August 2, 2004, the same day that Roth filled out her workers compensation worksheet, Roth's store received a mystery shop score of 55 out of 75 points, thus earning a red designation. (Def. 56.1(a) St. ¶ 36.) Another mystery shop was conducted on October 4, 2004. (Def. 56.1(a) St. ¶ 37.) This time, Roth earned 35 out of 75 points, giving her a second consecutive red score. (*Id.*) On October 17, 2005, Roth informed District Manager Dalton that she was waiting for her worker's comp to "come through" so she could see her doctor again. (Pl. 56.1(b)(3) St. ¶ 13.) The very next day, Roth was officially reprimanded by Dalton. (Def. 56.1(a) St. ¶ 36.)

On November 9, 2004, Dalton sent Roth a memo addressing her job performance. (Def. 56.1(a) St. ¶ 40.) The memo stated that Roth was insufficient in recruiting, training, coffee breaks, dipping, capturing customer contact information, distributing the corporate newsletter and leadership. (Roth Dep. Ex. 22.) On November 11, 2004, Roth submitted a memo in response to the criticisms. (Roth Dep. Ex. 24 at ROTH 0202.) Roth conceded that she could improve in some areas, but asserted that she was generally meeting her workplace requirements. (*Id.*) The memo outlined Roth's plan to upgrade training within the store and addressed the following areas:

a) *Mystery shops* - Roth acknowledged that she needed to improve and stated that she had already "informed all employees the rest of our shops going forward must be gold or better."

b) *Customer Connect* - Roth stated that she achieved a rate of 36.17% even though she was only required to achieve a rate of 30%

c) *Dipping* – Roth conceded that she was under performing: "I have tried to increase our dipping percentage. We always have fresh fruit and as well as macaroons ... we also dip several times a day ... I am open to any and all suggestions ... we will call other stores to see if they can give us some pointers as well."

d) *Coffee Breaks* – Roth stated that she had two coffee breaks set up for December; and was still looking to set up coffee breaks for November.

e) *Newsletter* - Roth claimed that she was on pace to distribute the newsletter in December.

(*Id.*)

Godiva asserts that Roth received another poor mystery shop score in December of 2004 (Def. 56.1(a) St. ¶ 58.) Roth denies that a December mystery shop took place. In support of its claim, Godiva cites to Dalton's declaration and Roth's deposition, but failed to provide the Court with any documentation. This is especially puzzling because Roth's deposition testimony can hardly be construed as supporting Godiva's contention:

> I didn't get another shop until January, and that was a perfect platinum 75 shop, like I didn't get shopped in November I don't believe, *I didn't get shopped in December,* and I clearly remember the one in January was a perfect one, and nothing was said about that.
>
> (Roth Dep. at 169.) (emphasis added)

In any event, on January 18, 2005, Dalton met with Roth to discuss performance issues. (Def. 56.1(a) St. ¶ 63.) Roth was given another set of objectives labeled the "January corrective action plan." (Def. 56.1(a) St. ¶ 65.) Roth had to improve her future mystery shops scores, customer connect percentage, coffee breaks, and dipped fruit sales. (*Id.*) In addition, Roth had to distribute the company newsletter and conduct training workshops and receive a score of at least 80% on her next store visitation. (*Id.*)

According to Roth, by the end of January her performance had improved and she was meeting her goals. Specifically, Roth claims that she scheduled two coffee breaks,

submitted the newsletter, and had turned in all of the training information. (Pl. 56.1(b)(3) St. ¶ 30; Roth Dep. at 226.) Moreover, Roth received a perfect score on her January mystery shop. (Pl. 56.1(b)(3) St. ¶ 30.) Roth's evaluation states that her staff used "mouthwatering descriptions" of the chocolate, "actively listened" to the shopper, and enthusiastically and sincerely interacted with customers. (Pl. Ex. 8 at Roth 0451-52.) The mystery shops are administered by an independent third party and Godiva does not dispute the results of the January evaluation.

On February 4, 2005, Dalton visited Roth to see how she was progressing. (Def. 56.1(a) St. ¶ 67.) Dalton evaluated Roth using a list of criteria and gave the store 48 out of 77 points (62%). (Def. 56.1(a) St. ¶ 67.) This score was below the 80% that Dalton required for the January corrective action plan. (*Id.*) Roth denies that she was performing poorly and contends that Dalton was determined to give her a failing score regardless of the circumstances. Godiva terminated Roth's employment on February 8, 2005. (Def. 56.1(a) St. ¶ 3.)

## II. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and that judgment as a matter of law should be granted in their favor. *Celotex, 477 U.S. 324.*

Once the moving party has met the initial burden, the nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County*, Ill., 424 F.3d 659, 667 (7th Cir. 2005). The nonmoving party must produce specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmoving party can not generate an issue of fact with speculation or conjecture. *Borcky v. Maytag*, 248 F.3d 691, 695 (7th Cir. 2001). Finally, all evidence and inferences must be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. 255.

### III. Analysis

The Illinois Workers Compensation Act makes it unlawful for employers to retaliate against employees that file for workers' compensation. 820 Ill. Comp. Stat. 305/4(h). To whit, Illinois courts have recognized an independent cause of action for retaliatory discharge. *Borcky*, 248 F.3d at 695. To make out a claim for retaliatory discharge, a plaintiff must show that: "(1) she was an employee before the injury; (2) she exercised a right granted by the Workers Compensation Act; and (3) her discharge was causally related to her filing a claim under the Workers Compensation Act." *Id.* (quoting *Clemons v. Mechanical Devices Co.*, 184 Ill. 2d 328, 704 N.E. 2d 403, 406 (Ill. 1998)). Here, the only issue in dispute is the third element – causation.

Causation is not established where the employee was fired for a valid non-pretextual reason. *Czubak v. ICEE USA Corp.*, No. 96-C2838, 1997 U.S. Dist. LEXIS 11966, at *9, 1997 WL 467283 (N.D. Ill. Aug. 13, 1997). As the moving party, Godiva offered a cogent argument backing its assertion that Roth was fired because she failed to

7

meet performance objectives. To survive summary judgment, Roth must show that a rational jury could find that Godiva's proffered reasons for her termination were pretextual. In the context of retaliatory discharge, a "pretext" is more than just a mistake on the part of the employer; it is a "lie, specifically a phony reason for some action." *McCoy v. Maytag Corp.* 495 F.3d 515, 523 (7th Cir. 2007).

To show pretext, courts in this Circuit have allowed plaintiffs to rely on either direct evidence - i.e. an admission by the decision maker that her actions were motivated by impermissible motives - or circumstantial evidence.[2] *Sylvester v. SOS Children's Vills. Inc.*, 453, F.3d 900, 905 (7th Cir. 2006); *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1062 (7th Cir. 2001) (sustaining verdict for employee that only relied on circumstantial evidence to show retaliation). Circumstantial evidence can include suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus and other evidence which allows the jury to reasonably infer retaliation. *Sylvester*, 453 F.3d at 903; *Tullis*, 243 F.3d at 1065. Here the evidence presented by Roth is entirely circumstantial, but this does not doom her case: "[p]erhaps on average circumstantial evidence requires a longer chain of inferences, but if each link is solid, the evidence may be compelling ..." *Sylvester*, 453 F.3d at 903.

*Suspicious Timing*

Roth received numerous awards in the months preceding her termination. Despite these achievements, Roth's reputation deteriorated in the fall of 2004 when she claims

---

[2] This Court is sitting in diversity and the substantive rule of decision is rooted in state rather than federal law. Thus, it is unclear whether the federal "McDonnell – Douglas" burden shifting framework should apply or whether the traditional state law analysis should be used. *See Bourbon v. Kmart Corp.*, 223 F.3d 469, 473-77 (7th Cir. 2000) (Posner, J., concurring) (discussing *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)) Regardless of the framework, Roth has presented enough evidence to allow a rational jury to find that she was retaliated against because of her workers compensation claim.

8

that Godiva began disciplining her solely to lay the ground work for her termination. On October 17, 2004, Roth informed Dalton that she filed for workers compensation. The very next day, Dalton formally reprimanded Roth. As evidenced by her mystery shop scores, Roth was not a perfect employee. But, the mystery shop is only one indicator of success. Dalton testified that the "Golden Touch" award was a national honor given to Godiva's "top performers" based on objective statistical criteria. (Dalton Dep. at 25.) Roth won the Golden Touch award for her achievement in October, informed her supervisor of her workers' compensation claim, and was reprimanded the very next day. Godiva contends that the timing of the reprimand was coincidental; a rational fact finder could disagree.

The Seventh Circuit analyzed a similar claim of suspicious timing in *Lang v. Illinois Dept. of Children and Servs.*, 361 F.3d 416 (7th Cir. 2003). In *Lang*, the plaintiff filed a grievance with the EEOC stating that his employer issued cell phones to the white employees, but refused to do the same for the African-American employees. *Id.* at 417. Ten months later, the plaintiff was fired, and he sued his former employer under the theory of retaliatory discharge. *Id.* at 419. The plaintiff claimed that he had five years of positive performance reviews, but the same month he filed his grievance his supervisor began "issuing frequent written reprimands of his work – something she had never done before." *Id.* at 420.

The court began its analysis by noting that suspicious timing alone is rarely enough to create a triable issue of fact. *Id.* at 419. But, evidence of suspicious timing should not be completely discounted: "close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is

9

also other evidence that supports the inference of a causal link." *Id.* The court observed that: "almost immediately after Lang filed his discrimination complaint with the EEOC, [the supervisor] began issuing frequent written criticisms of his work"; thus the timing of the discipline was "extremely suspicious." *Id.* at 420. The court went on to hold that Lang had presented enough circumstantial evidence to survive summary judgment: "taken together, the extremely short lapse of time between Lang's complaints and the increased discipline he faced, the baseless attendance violations, evidence that [the supervisor] was holding him to unrealistic standards, and his previous five-year flawless employment record raise the inference of causation." *Id.* at 421.

Here, Roth presented evidence to demonstrate that: (a) she had an outstanding track record with the company; (b) she faced increased criticisms *the day after* her supervisor learned that she filed for workers compensation; and (c) the reprimand occurred the same month that she received a national award based on her performance. The immediate increase in criticism can be construed as evidence that Godiva had "pretextual" motive in reprimanding Roth; i.e. Godiva began cataloging Roth's flaws in order to create a fig leaf to conceal its retaliatory intent. *See Hobbs v. PeopleSoft, Inc.*, No 99-C3147, 2000 U.S. Dist. LEXIS 17087, at *7, 2000 WL 1741891 (N.D. Ill. Nov. 22, 2000) (denying employer's motion for summary judgment where employer was "biding its time to create a space between the date of the claim and the date of the discharge"); *Czubak*, 1997 U.S. Dist. LEXIS 11966, at *11-12 (fact that plaintiff received written warnings the day he returned to work from his injury is suspicious)

### Godiva's Disproportionate Response

Roth contends that Godiva used trumped up job deficiencies as a pretext to fire her. Specifically, Roth claims that the alleged "problems" were not offenses that normally lead to termination. To bolster her case, Roth points to the deposition testimony of her supervisor Michelle M. Dalton.

> Q. The stores that did not always achieve a point – a score of 70 points or higher on all mystery shops, were their mangers terminated from Godiva?
> A. No.
>
> Q. Were the managers of the other stores you had supervisory authority over that did not achieve a weekly customer connect capture rate of 45% terminated?
> A. No.
>
> Q. Were the managers of the other stores that you had supervisory authority over that did not conduct two coffee breaks with current or potential corporate client terminated?
> A. No.

(Dalton Dep. at 11-13.)

A fact finder is permitted to "take into consideration the severity of the action and the circumstances surrounding the event in determining whether defendant's explanation for discharge is really pretextual ..." *Czubak*, 1997 U.S. Dist. LEXIS 11966, at *11. In a supplemental declaration Dalton attempts to undo the damage of her testimony by stating that no other managers were performing as poorly as Roth. (Dalton Supp. Decl. at ¶ 10.) This statement conflicts with the fact that Roth received the following awards just prior to her termination: Model store certification for 2004, Golden Touch Award for February, April, May, August, and October 2004, Gold Star Sales Performer for Quarters 2-4 of 2003/2004, and a perfect mystery shop in January 2005. Roth alleges that but for the workers' compensation claim, her job performance would not have warranted termination. Dalton's testimony on the subject lends supports to this argument.

*Personal Animus*

Evidence of antagonistic behavior can show that an employer had a retaliatory motive. For example, in *Czubak* the plaintiff was reprimanded on the same day he returned from his injury, and was forced to wear rubber gloves, a back brace, a dust mask, and goggles before his supervisor would allow him to clean the office sink. *Czubak*, 1997 U.S. Dist. LEXIS 11966, *13. The court held that the conduct of the plaintiff's supervisor was sufficient to infer that the plaintiff was ultimately fired due to anger over his workers' compensation claim. *Id.*

Similarly here, there is evidence of animosity between Roth and her supervisor. Roth alleges that immediately after she filed for workers' compensation, Dalton became hostile and repeatedly accused her of fabricating the injury. Roth's claim is at least partly supported by Godiva's insurance records. On October 28, 2004, a claims adjuster spoke with a Godiva employee regarding Roth's claim. The claims adjuster's call log states:

> Talked to [Godiva] contact Rosita Smith ... *I asked why Michelle [Dalton] was questioning the claim.*

(Pl. Ex. 12; ROTH 0435.) (emphasis added)

It is pellucidly clear that Dalton thought that Roth was lying about her injury.[3] Moreover, Dalton apparently espoused her mistrust of Roth to her fellow Godiva employees. In light of the claims adjuster's notes, it would not be difficult for a jury to accept Roth's version of events: Dalton grew increasingly irritated by Roth's insistence that she was genuinely injured, and the decision to fire Roth was an outgrowth of the acrimony surrounding her workers' compensation claim.

---

[3] Ultimately, Roth had surgery to repair two herniated disks in her back. (Roth Dep. at 274.)

12

In response, Godiva argues that the claims adjuster's call log is inadmissible hearsay. The Court finds however, that the call log fits within the ambit of the business records exception to the hearsay rule.[4] Along the top of the call log are data fields for: (a) Note Type; (b) Date; (c) Author; and (d) Subject. Moreover, the call log contains entries from various days that all conform to the same format. The form and appearance of the call log indicate that the practice was standardized and routine.

The claims adjuster's job is to gather information about workers' compensation claims. Presumably, the claims adjuster's notes are not spun from whole cloth.[5] The document (which was originally in Godiva's possession) was turned over to Roth during discovery, thus there is no allegation of tampering or falsification. The Court finds no reason to doubt the accuracy of the call log, nor does Godiva offer one.[6] A business "depends on the accuracy of its recordkeeping, its records, although of course not sworn, are likely to be at least reasonably accurate, or at least not contrived ..." *Thanongsinh v.*

---

[4] Fed. R. Evid. 803 states in pertinent part: "[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness ... (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation ..."

[5] For example, in his treatise on evidence professor G. Michael Fenner states: the "closer preparation of the record is to the core of the business, the more likely it is to be trustworthy ..." G. Michael Fenner, The Hearsay Rule 237 (Carolina Academic Press 2003).

[6] Interestingly, Godiva relies on the district court's opinion in *Thanongsinh v. Sch. Dsit. U-46*, No. 03-C8842, 2005 U.S. Dist. LEXIS 16457 to argue that the unauthenticated call log should not be considered. (Def. Reply Mem. at 11.) In *Thanongsinh* the district court refused to consider an unauthenticated business record even though it had all the trappings of an accurate document. On appeal, the district court's reasoning was explicitly rejected by the Seventh Circuit: "[t]he district court abused its discretion when it excluded the interviewers' score sheet ... this document is admissible under the business record exception to the hearsay rule." *Thanongsinh v. Bd. of Educ.*, 462 F.3d at 775. Additionally, the Seventh Circuit noted that the author of document could be called at trial to authenticate the records if necessary and that "no evidence has been offered ... to suggest that the chain of custody was broken or that the any individual had access to or tampered with the record." *Id.* at 777. Similarly here, the identity of the author is not in doubt, and there is no evidence or suggestion that the call log was fabricated or unreliable. If need be, Counsel for Roth could authenticate the document at trial using the custodian's testimony, or through written certification pursuant to Fed. R. Evid. 902(11).

*Bd. of Educ.*, 462 F.3d 762, 776 (7th Cir. 2006) quoting *Lust v. Sealy, Inc.*, 383 F.3d 580, 588 (7th Cir. 2004). Accordingly, the Court finds that the call log has the necessary indicia of trustworthiness to be admitted under Federal Rule of Evidence 803(6).[7]

Godiva next argues that some of the statements on the call log contain hearsay. Godiva is correct; there are indeed multiple levels of hearsay. But, Roth does not need to rely on every statement in the document to illustrate that Dalton thought she was lying about the injury. The claims adjuster's own statements about his own actions on October 28, 2004, are sufficient: "I talked to Rosita Smith ... *I asked why Michelle was questioning the claim.*" The Court need not consider the statements on the call log from the other eight days.

As additional evidence of antagonistic behavior, Roth alleged that Godiva manipulated the job requirements to make sure that she fell short of her objectives. For example, Godiva claims that store managers were expected to achieve a Customer Connect percentage of 45% and because Roth only achieved 36%, she was under-performing. By contrast, Roth stated she was only required to achieve a percentage of 30 - 35%, and has no recollection of her supervisor telling her otherwise. Roth's assertion comports with an email she wrote to Dalton on November 11, 2004: "the company percentage for Customer Connect is 30% ... our percentage is 36.17%" (Roth 0202). Additionally, Roth produced Godiva's Customer Connect Policy which states in pertinent part:

---

[7] There is also an entry on the call log by Rosita Smith that states that Dalton was questioning the injury. This statement could be admissible as party admissions under Fed. R. Evid. 801(d)(2)(D). An admission is not hearsay when it is offered against a party and is a statement by the party's agent concerning a matter within the scope of the agency or employment, and made during the existence of the relationship. It should be noted that the Federal Rules of Evidence Advisory Committee called for "generous treatment of this avenue to admissibility." Fed. R. Evid. 801(d) advisory committee's note (2). Whether as a party admission or as a business record, the call log can be considered by the Court.

14

> Acceptable minimum standards of compliance :
> - City Stores/Transportation Centers – Valid CC % at 20% or higher
> - All other stores: Valid CC % at 30% or higher.

(Roth Dep. Ex. 9)

Roth's deposition testimony on the subject is equally consistent:

Q: All right. That percentage was raised in the fall of 2003 to 45%, correct?

A. I don't believe that is correct.

(Roth Dep. at 68) Although Godiva is in the best position to produce documents regarding its corporate policies, Godiva failed to provide any evidence (other than Dalton's affidavit) of its decision to increase the requisite Customer Connect percentage. Roth argues that this is because the percentage was never officially increased; Godiva disagrees. But without any documentation, Godiva's claims ring hollow.

According to Roth, once her supervisor learned of her workers' compensation claim, her termination was a fait accompli. Roth avers that even if she achieved a 45% Customer Connect rate, Godiva would have announced *ex post facto* that the requirements had been increased. For the record, Godiva disputes Roth's characterization of its practices and its motives. But, the insurance records coupled with Roth's claims that her supervisor: (a) was hostile; (b) utilized shifting performance requirements; and (c) immediately began criticizing her after the injury; support the inference Godiva soured on Roth because she exercised her statutory right to file for workers' compensation. *See* Tullis, 243 F.3d 1066 (plaintiff's boss abruptly became "angry and unfriendly" after plaintiff filed for workers' compensation and that "could have led the jury to believe that plaintiff was not rehired "because he filed a workers' compensation claim"); *Rodriguez v. Dunbar Armored, Inc.*, No. 05-C4857, 2007 U.S.

Dist. LEXIS 23437, at *19, 2007 WL 1017668 (N.D. Ill. Mar. 30, 2007) (denying summary judgment where employer was "not too happy" and "bumped heads" with plaintiff over his workers compensation claim).

## CONCLUSION

Rarely is there a smoking gun in retaliatory discharge cases. Thus, reliance on circumstantial evidence is both permissible and practical. Here, the circumstantial evidence if taken alone would not preclude summary judgment. But in the aggregate, Roth's evidence is sufficient to allow a reasonable jury to conclude that Godiva's stated reasons for termination were pretexutal. For the foregoing reasons Godvia's motion for summary judgment is DENIED.

IT IS SO ORDERED

_1/7/08_
Dated

The Honorable William J. Hibbler
United States District Court